ENGLAND, Justice
(concurring in part and dissenting in part).
I concur with the affirmance of the summary judgment for the defendant Colbert County. However, because I believe the plaintiff Willa D. Jones presented substantial evidence of wantonness on the part of the defendant Norfolk Southern Railway (hereinafter, the “Railway” or “Norfolk Southern”), I must respectfully dissent from the affirmance of the summary judgment for the Railway.
The evidence in the record, viewed in a light most favorable to the plaintiff Jones, suggests these facts:
On the afternoon of August 8, 1996, a westbound train traveling at 53 miles per hour struck a van driven by Robert Jones, at a grade crossing in Colbert County. Mr. Jones was killed in the collision. Ed *700 Haynes was the engineer on the train, and J.C. Kilpatrick was the conductor.
The dangers associated with this crossing were well known to Norfolk Southern. Eight collisions between trains and automobiles had occurred at this crossing between 1995 and the date of Mr. Jones’s accident; two of those collisions had taken place within two months of this collision. Despite those other collisions, Norfolk Southern had made no changes to the crossing. Norfolk Southern had, however, attempted on two occasions to have the crossing closed. It was not successful either time.[2]
This crossing was especially dangerous, for many reasons. The crossing is formed by the intersection of the railroad with a short, asphalt-paved access road or approach, which connects two parallel roads on either side of the tracks, Old Memphis Pike to the north and U.S. Highway 72 to the south. The portion of the road north of the tracks — the portion Mr. Jones was on as he approached the tracks — is not sufficiently wide to permit two lanes of traffic, and it has no markings to indicate the presence of railroad tracks and no “stop bar” to show motorists where to stop before crossing the tracks.
Because the railroad tracks sit 12 to 16 feet higher than either Old Memphis Pike or Highway 72, the crossing road forms an extremely steep “hump” that drivers must negotiate when crossing the railroad tracks. According to the Colbert County engineer, the hump was so severe that drivers could not see vehicles approaching from the opposite direction. Indeed, in an attempt to lessen the danger associated with traversing this crossing, motorists had adopted a local custom of sounding their horns to warn drivers of unseen vehicles on the opposite side.
Finally, the crossing contained no “active” warning devices that would give motorists notice that a train was approaching. For example, it had no “crossing gate.” A crossing gate could have bells that ring loudly and a wooden “arm” that would automatically drop across the access road when a train approaches, so as to prevent automobiles from crossing the tracks, and that would rise as the train has passed. In fact, the north side of the road has only a combination railroad crossbuck[3] and “stop” sign. Norfolk Southern has a 50-foot right-of-way on the north side of the crossing, and this right-of-way is under Norfolk Southern’s exclusive control. Haynes, the engineer, had knowledge of the dangerous conditions associated with the crossing and knew about the collisions that had occurred there.
Kilpatrick testified that the train was about a quarter mile from the crossing when he first saw Mr. Jones’s vehicle on the north side of the tracks. According to the testimony, Mr. Jones turned left from Old Memphis Pike, heading south toward the crossing, and then stopped. Haynes testified that Jones’s van was completely off Old Memphis Pike when it stopped the first time; this would place Jones’s van about 35 feet from the railroad tracks. Although Haynes and Kilpatrick were aware of how near Jones’s van was to the tracks, they did nothing either to warn *701 Jones of the train’s presence or to stop the train. In fact, the train continued to move at 53 miles per hour, even though the speed limit at that place was only 50 miles per hour. Apparently not seeing or hearing the train, Jones drove closer to the tracks. The testimony is uncontroverted, that Jones had stopped the van a second time before he finally drove over the tracks. Jones’s van was perhaps as close as five feet to the edge of the track at the point of the second stop. Haynes and Kilpatrick once again had the opportunity' to attempt to warn Jones of their presence or to attempt to stop the train before it struck Jones’s van, but they did neither. A statement made by Haynes after the accident indicates that after Jones’s van stopped for the second time, Haynes again saw the van “moving slowly toward the crossing. It stopped [again] clear of the crossing, then slowly moved onto the tracks, stopping again with the front bumper about even with the south rail when we were about 50 feet from the crossing.” (Emphasis added.)
Janice Johnson testified by affidavit. She testified that she lived on Old Memphis Pike Road, very near the scene of the accident. Johnson has a direct view from her front yard of the railroad crossing where the accident occurred. At about 1:00 p.m. on the day of the collision, Johnson was driving west on Highway 72 when she noticed a train heading toward her home. As Johnson drove over the railroad crossing toward her home, she also noticed a van leaving Davidson’s barbecue restaurant and, when Johnson stopped her car to get her mail, she saw the van on the “crossing” or “access” road. Johnson stated that she had been “listening and hoping for” the train to sound its horn since she got out of her car, but the train did not sound a horn or a whistle. Johnson further testified that the train suddenly appeared from out of the trees further down the track, but that she still had not heard the train’s horn or whistle. Johnson stated that a “split second” later, the train hit the van, sending it into the air. Johnson said she could determine When a train had applied its emergency brakes from a telltale surge of compressed air the brakes release and a “squeal” the brakes make as they engage. Johnson testified that she did not hear those sounds until after the train- had struck Jones’s van. Johnson also stated that she never heard the train sound its horn or its whistle.
The evidence, viewed in a light most favorable to Jones, indicates that Haynes and Kilpatrick did not sound the train’s whistle, bell, or horn and did not apply the brakes or the emergency brakes before the train hit Jones’s van.
Section 37-2-81, Ala.Code 1975, imposes certain duties on engineers or any other person or persons operating a locomotive:
“The engineer or other person operating a locomotive on any railroad must blow the horn or whistle or ring the bell:
• “(1) At least’ one fourth of a mile before reaching any public road crossing or any regular station or stopping place on such railroad and continue with such signal at short intervals, imtil such crossing or such station or stopping place has been passed;
“(2) Immediately before and at the time of leaving a station or stopping place and also immediately before entering any curve crossed by a public road, not marked in accordance with Section 37-2-80, where he cannot see at least one quarter of a mile ahead, and must approach and pass such unmarked crossing at such speed as to prevent an accident in the event of an obstruction at the crossing; and
*702 “(3) At short intervals, on entering into, or while moving within or passing through any village, town or city.

“He must also, on perceiving any obstruction on the track, use all means within power [sic], knoum to skillful engineers, such as applying brakes, in order to stop the train.”

(Emphasis added.) The mere violation of a statutory duty amounts to but simple negligence and does not constitute willful or wanton misconduct. Callaway v. Griffin, 245 Ala. 598, 18 So.2d 547 (1944); Smith v. Central of Georgia Ry., 165 Ala. 407, 51 So. 792 (1910). To establish wantonness, one must show actual knowledge, or that which is in law equivalent thereto, that the person injured was in peril, coupled with the conscious failure to act to avert the injury. Haynes and Kilpatrick had actual notice that the crossing was inherently dangerous and that Jones was about drive his van in front of the train. Therefore, Haynes and Kilpatrick’s failure to act constituted wantonness.
In Hamme v. CSX Transp., Inc., 621 So.2d 281 (Ala.1993), this Court considered facts that were similar in many ways to those in the present case. William Frank Hamme and his wife Sheila brought negligence and wantonness claims against CSX Transportation and its engineer, H.L. Wood; those claims arose out of a collision between a CSX train and a truck driven by Mr. Hamme. Sheila Hamme claimed a loss of consortium. At the close of the Hammes’ case, the defendants moved for a directed verdict on the negligence and wantonness claims. The trial court denied a directed verdict on the negligence claim, but directed a verdict for CSX and Wood on the wantonness claim. The trial court instructed the jury on the law pertaining to negligence and contributory negligence. The jury returned verdicts in favor of CSX and Wood on the negligence claim. The Hammes appealed the resulting judgment, but only as it related to their wantonness claim.
The Court held that the Hammes had presented “substantial evidence” indicating that CSX and Wood had acted with “ ‘knowledge of the danger or a consciousness that injury was likely to result from an act or an omission to act,’ ” 621 So.2d at 283, 284 (quoting Burlington N.R.R. v. Whitt, 575 So.2d 1011, 1021 (Ala.1990)), and that the trial court should have submitted to the jury the wantonness claim seeking compensatory damages. This Court wrote:
“To be wanton, it is not required that the actor know that a person is within the zone made dangerous by the actor’s conduct; rather, it is sufficient that the actor knows that there is a strong possibility that another might rightfully come within the zone. See Restatement (Second) of Torts, § 500, comment d (1965); Joseph v. Staggs, 519 So.2d 952 (Ala.1988). The actor’s knowledge may be proved by showing circumstances from which the fact of knowledge is a reasonable inference; it need not be proved by direct evidence. Wantonness does not require an intent to injure another, but may consist of an inadvertent act or failure to act, when the one acting or failing to act has knowledge that another is probably imperiled by the act or the failure to act and the act or failure to act is in reckless disregard of the consequences. Id.; Roe v. Lewis, 416 So.2d 750 (Ala.1982); Atlantic Coast Line R. Co. v. Brackin, 248 Ala. 459, 28 So.2d 193 (1946).
“The undisputed facts of this case establish the following: The collision occurred around 6:00 a.m. on a rainy, semi-dark morning at the 9th Street railroad crossing in Gadsden, Alabama. Frank Hamme was travelling approxi *703 mately 15 miles per hour, with his windshield wipers on, but he had no problem with visibility. He was familiar with the crossing, having passed it numerous times before, but on this day he did not stop the truck at the crossing. Rather, he slowed down to 2-3 miles per hour and looked in both directions; he saw no train. When his front tires were on the tracks and he looked to the right, he saw the train 20-30 feet away and he then ‘stomped on [the] gas to beat [the] train.’ The train was travelling at approximately 15 miles per hour. The train was approximately 900 feet from the crossing, when Wood, the engineer of the train, first saw Frank Hamme’s truck, which was then approximately 500 feet from the railroad crossing. Wood thought Mr. Hamme was not going to stop at the crossing.
“Other evidence is disputed. However, viewed in the light most favorable to the Hammes, as required under our applicable standard of review, it reveals the following: Although there was a company rule that the lights on the front of the engine were to be on at all times, Mr. Hamme saw no lights on the train. Although it was customary to blow the whistle for at least 10 seconds when the train reached a whistle board marker along the track, approximately 1000 feet from the crossing, Mr. Hamme heard no whistle. Although the railroad signals at the crossing, i.e., the flashing lights and ringing bells, were automatically activated and deactivated when the train passed over a specific circuit on the track, Mr. Hamme saw no lights flashing and heard no bells ringing at the railroad crossing. Although Wood knew that Mr. Hamme was not going to stop at the railroad crossing, Wood did not apply the emergency brakes until after the train had hit the truck.
“While we recognize a continuing duty on the part of a person intending to cross railroad tracks to stop, look, and listen for approaching trains, if there is substantial evidence that the railroad failed to use all reasonable means to warn the approaching driver of his danger, after the railroad discovered the approaching driver’s peril, or if there is substantial evidence that the railroad failed to stop the train after discovering the approaching driver’s peril, if it could have done that in time to avoid the collision, then the question of wantonness is for the jury. Southern Ry. v. Diffley, 228 Ala. 490, 153 So. 746 (1934).
“Based on the foregoing, and in accordance with our standard of review, we hold that the Hammes presented substantial evidence that, after discovering Frank Hamme’s peril, Wood failed to use all reasonable means to warn Mr. Hamme of that peril and/or that Wood failed to stop the train, assuming that he could have done so in time to avoid the collision. Thus, the Hammes presented a fact question for the jury on the issue of wantonness.
“Thus, to the extent that the Hammes seek compensatory damages on the wantonness claim, because ‘fair-minded persons in the exercise of impartial judgment [could] reasonably infer the fact sought to be proved,’ i.e., wantonness, West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), the trial court erred in directing a verdict for CSX and Wood. Thus, we reverse the judgment as to the claim for compensatory damages on the basis of wantonness.”
Hamme, 621 So.2d at 283-84.
If Hamme can be seen as a starting point for determining when the acts or omissions of a train’s crew be considered wanton, then the conduct of Norfolk *704 Southern and Haynes surely must be viewed as wanton. Hamme involved an engineer’s alleged acts and omissions. There were no allegations in Hamme that the section of track on which the engineer’s alleged wantonness took place was inherently dangerous. Here, the evidence established not only that the engineer and the conductor of the train knew of Jones’s peril and yet took no. action to warn Jones or to stop the train, but also that the men knew the crossing was inherently very dangerous. The evidence also establishes that Norfolk Southern had taken no measures to make the north side of the access road safer, even though the Railway, by virtue of its 50-foot right-of-way on that side of the tracks, had sole control of the crossing.
I believe the evidence created a jury question as to whether Norfolk Southern and Haynes were guilty of wantonness. Therefore, I would reverse the summary judgment insofar as it relates to the defendant Norfolk Southern. 'Thus, I dissent from the affirmance as to that defendant.

. The second attempt by Norfolk Southern to close this crossing came in 1996, after one of its trainmasters had received reports indicating that "many cars [had been] stop[ping] on top of the tracks as they were” traversing the crossing.

. "[A] railroad 'crossbuck' [is] a large 'X' made of two crossed pieces of wood or metal, painted white, with the words 'RAILROAD' and 'CROSSING' written across the overlapping pieces in black paint.” Ridgeway v. CSX Transp., Inc., 723 So.2d 600, 602 (Ala.1998).